IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| RONNIE GULLY, JR, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 3:22-cv-02816-RJD |
| | ) | |
| | ) | |
| LINDSEY TROTTER, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

## **MEMORANDUM and ORDER**

**DALY, Magistrate Judge:[1]**

Plaintiff Ronnie Gully, Jr., an inmate of the Illinois Department of Corrections ("IDOC") who is currently incarcerated at Menard Correctional Center, brought this action for deprivations of his constitutional rights pursuant to 42 U.S.C. § 1983. (Doc. 1; Doc. 19, p. 1). In the Complaint, Gully alleges Defendants violated his rights via a disciplinary hearing, his subsequent housing in segregation, and associated mental health issues and suicidal behavior. (*Id.*). He seeks monetary relief. (*Id.*).

Following threshold review of the Complaint, Gully was allowed to proceed on the following claims:

> **Claim 2:** **First Amendment retaliation claim against Nathan Attebury;**
>
> **Claim 3:** **Eighth Amendment deliberate indifference claim against Lyndsey Trotter for her handling of Gully's mental health and suicidal behavior; and**

---

[1] This matter has been assigned to the undersigned to conduct all proceedings through the parties' consent pursuant to 28 U.S.C § 636(c) and Federal Rule of Civil Procedure 73. (Doc. 34).

**Claim 6:**   **Intentional Infliction of Emotional Distress by Defendants Trotter and Attebury.**

(Doc. 19, pp. 5-6, 14).

This matter comes before the Court on Defendants Attebury's and Trotter's Motions for Summary Judgment (Docs. 95 & 96). Gully responded to both motions, (Docs. 105 & 106), and Defendants replied (Docs. 107 & 110). For the reasons explained below, Defendant Attebury's and Trotter's motions (Docs. 95 & 96) are **DENIED**.

## Factual Background

This is a summary of the parties' factual allegations based on the parties' statements of material facts viewed in the light most favorable to Plaintiff.

*Allegations Pertaining to Defendant Attebury*

In June 2021, Plaintiff sustained an injury to his leg requiring him to undergo surgery, which involved the placement of metal rods and several fixator screws.[2] (Plaintiff's Statement of Facts, Doc. 104, ¶ 1). On September 24, 2021, Plaintiff filed a Prison Rape Elimination Act ("PREA") allegation against one of Defendant Attebury's colleagues. (*Id.* at ¶ 2). On October 7, 2021, Plaintiff was returned to his cell by Correctional Officer Clark following a medical appointment. (*Id.* at ¶ 3). Plaintiff alleges that Correctional Officer Clark did not properly secure his cell door after returning Plaintiff to his cell. (*Id.* at ¶ 4). Realizing that the cell door had not been properly secured, Plaintiff stepped into the cell block corridor to alert IDOC staff. (*Id.* at ¶ 5). Defendant Attebury disputes that Plaintiff's cell door was not properly secured and argues that

---

[2] All citations to paragraphs in Plaintiff's Response to Defendant Attebury's Motion for Summary Judgment (Doc. 104) refer to Plaintiff's Statement of Facts (Doc. 104, pp. 4-6)—not to Plaintiff's response to Defendant's Statement of Material Facts (Doc. 104, pp. 1-4).

Plaintiff's presence outside his cell was a disciplinary infraction regardless of the status of the door. (Doc. 110, ¶ 4). He points to the incident report, which states that Plaintiff was seen kicking his door before walking out of his cell. (*Id.* at ¶ 5). The parties agree that thereafter, Plaintiff was instructed by IDOC staff to return to his cell, which Plaintiff willingly did. (Doc. 104, ¶ 6). Officer Clark wrote Plaintiff a disciplinary ticket for violations of 305 Unauthorized Movement and 105 Dangerous Disturbance. (*Id.* at ¶ 7).

On October 12, 2021, Defendant Attebury was one of two members on the Adjustment Committee who recommended Plaintiff be found guilty and serve three months C Grade and six months segregation. (Doc. 104, ¶ 8; Doc. 104-1, p. 321). Plaintiff alleges that Defendant Attebury improperly recommended Plaintiff be found guilty at the Adjustment Committee hearing in retaliation for the filed PREA allegation. (Doc. 104, ¶ 9). Specifically, Plaintiff testified that during the disciplinary hearing, Attebury accused Gully of lying about not kicking his door and stated "something to the extent . . . that [Gully] was a liar, because [he] lied already . . . about a PREA allegation" against Attebury's friend who would never do "that type of stuff." (Doc. 104-1, p. 107). He argues that his conduct amounted to intentionally inflicted emotional distress and that he suffered from depression, anxiety, PTSD, loss of sleep, and deprivation of privileges in the prison. (Doc. 104, ¶¶ 9-10).

Attebury denies those allegations. (Doc. 110, ¶ 8). He counters that, while he was one of the two committee members who made a recommendation, he was not the one who found Plaintiff guilty. (*Id.*). He denies retaliation and argues that he recommended Plaintiff be found guilty based on a disciplinary report stating that Officer Clark had secured Gully in his cell when Gully was heard kicking his cell door and observed walking on A-wing with his cell door open despite having

a wheelchair permit. (Doc. 110, ¶ 9). Attebury further points to the lack of evidence showing that

he was aware of Gully's serious mental health issues. (Doc. 95, ¶¶ 13-14). He alleges that without

access to mental health records or a Mental Health Disciplinary Review, he could not consider

Gully's mental health state. (*Id.* at ¶ 15)

On January 25, 2022, more than three months after Gully was found guilty, the Illinois

Department of Corrections Administrative Review Board ultimately deleted the 105 Dangerous

Disturbance charge and the imposed six-month segregation, finding the charge to be

unsubstantiated. (Doc. 110, ¶ 13). Notwithstanding the Administrative Review Board finding,

Plaintiff did have to serve the majority of the six-month segregation with loss of privileges. (*Id.*).

Plaintiff testified that he received about 300 charges while in IDOC custody. (Doc. 95, ¶ 17).

*Allegations Pertaining to Defendant Trotter*

Gully was in restrictive housing ("RH") from September 24, 2021, through October 13,

2021, during which time he was being monitored by Defendant Trotter. (Plaintiff's Statement of

Facts, Doc. 105, ¶1).[3] On October 13, 2021, Gully was evaluated by Defendant Trotter for his

suicide potential and mental health progress session. Gully wrote a letter to Defendant Trotter

indicating his suicidal intent. (*Id.* at ¶ 5). As a result of the suicide threat, Defendant Trotter moved

Gully to the crisis area and placed him on a 15-minute crisis watch. (*Id.* at ¶ 6). She ordered that

he be seen by a mental health professional every 24 hours. Gully was provided various materials

to prevent self-harm, including a crisis mattress, smock, blanket, and finger foods. (*Id.*). Gully

exhibited a history of suicidal intent while housed in the crisis unit. (*Id.* at ¶ 7). On October 14,

---

[3] All citations to paragraphs in Plaintiff's Response to Defendant Trotter's Motion for Summary Judgment
(Doc. 105) within this section refer to Plaintiff's Statement of Facts (Doc. 105, pp. 5-8).

Page **4** of **21**

2021, he stated in his mental health progress session, "I just can't find a reason to keep going. Nobody loves me or give[s] me empathy." "I'm just going to cut myself." (*Id.*).

On October 16, 2021, Gully stated during his mental health progress session: "I'm good. I'm still feeling suicidal." (*Id.* at ¶ 8). On October 26, 2021, Gully stated, "I'm still suicidal and if you send me back to a seg cell I'm going to find some metal and slit my wrists or hang myself." (*Id.* at ¶ 9). On October 30, 2021, Gully stated, "[E]verything's the same. I'm suicidal, and no one cares," and refused to engage with a mental health professional. (*Id.* at ¶ 10; Doc. 106, ¶10). On October 31, 2021, during a mental health progress session with Trotter, Gully stated, "I [have] been looking for a staple to cut myself with in here." (Doc. 105, ¶ 11).

Gully spoke to Defendant Trotter again on November 1, 2021, stating, "I am still suicidal, I am still thinking about death and ways to kill myself." (Doc. 105, ¶ 12). On November 2, 2021, Gully indicated to Defendant Trotter that he had taken up to thirty pills to "kill myself." (*Id.* at ¶ 12). Gully was then assessed by medical and transported to the healthcare unit and then to an outside hospital. (*Id.*). Gully was placed on a four-hour evaluation and was discharged thereafter, as his vitals were within normal limits. (Doc. 106, ¶ 13; Doc. 97-6, p. 4). The medical provider indicated doubts about Gully's consumption of the pills. (Doc. 97-6, p. 4). Defendant Trotter, after consultation with Dr. Boose, moved Gully to a continuous crisis placement. (Doc. 105, ¶12).

On November 6, 2021, while on a 30-minute crisis watch, Gully stated to a mental health professional, "I'm still homicidal and suicidal," and declined interaction with the mental health professional. (Doc. 105, ¶ 14; Doc. 106, ¶ 14). On November 9, 2021, Gully stated during his mental health progress session that he would beat his head until he was unconscious or spill his brains after raising concerns that "no one is taking me seriously." (Doc. 105, ¶ 15). Gully was

placed once more on continuous crisis watch. (*Id.*). That same day, Gully was sent to the healthcare unit to see medical after hitting his hand several times on the crisis door and indicating he was still suicidal. (*Id.* at ¶ 16).

On November 15, 2021, Defendant Trotter met with Gully for a mental health progress session. (Doc. 105, ¶ 17). During this meeting, Trotter advised Gully that she was recommending a transfer to the Pontiac Correctional Facility, which had a mental health unit and could provide a higher level of care for his mental health needs. (*Id.*). Gully was advised of the potential benefits of the transfer to the Pontiac facility. (*Id.*). The Mental Health Progress Note indicates that this conversation took place outside Gully's cell near the shower area. (*Id.*). Gully was provided a safety pen to sign off on the transfer paperwork, and the pen was retrieved. (*Id.*).

On November 16, 2021, Gully reported to Defendant Trotter that he had cut his wrists the day prior with his orthopedic boot but denied current thoughts of self-harm or suicide. (Doc. 105, ¶ 18; Doc. 106, ¶ 18). Trotter ordered that Gully be placed on a 10-minute crisis watch, which provides for more intensive observation for at-risk inmates. (*Id.*).

On November 17, 2021, Trotter authorized Gully to be served with disciplinary tickets and a safety pen so he could sign them before leaving. (Doc. 105, ¶ 19). Gully was presented with the disciplinary ticket while he was secured in his cell. (*Id.*). According to his version, Trotter gave Gully the pen and told him that he would find a way to hurt himself, adding, "if you're going to kill yourself, you're going to do it anyway, it's only a matter of time, have fun at it." (*Id.* at ¶ 20). Trotter denies making those statements. (Doc. 106, ¶ 20). She further points to medical records indicating that Gully told a nurse at the emergency room on November 17, 2021, that "another inmate was telling him to kill himself." (*Id.*).

The parties agree that Gully tore up the disciplinary tickets and threatened to harm himself. (*Id.*). He refused to return the safety pen. (*Id.*). Thereafter, he reported that he "shoved the safety flex pen up his anal canal." (*Id.* at ¶ 21). He was sent to an outside hospital for further evaluation, with the medical records showing that the pen "was not fully inserted into the rectum" and that the medical provider was able to retrieve it "without pain or complications." (Doc. 97, ¶ 26; Doc. 97-6, p. 3). Trotter saw Plaintiff on November 18, 2021, for his mental health progress session. (Doc. 97, ¶ 28). He apologized to Trotter for his behavior, suggesting that he was frustrated because he wanted to "use the phone to call people." (*Id.*). He denied suicidal ideation and agreed to be served with his disciplinary tickets. Trotter moved Plaintiff to a 15-minute crisis placement to be seen by a mental health professional every 24 hours. (*Id.*).

## Summary Judgment Standard

Summary judgment is appropriate only if the moving party can demonstrate "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986); *see also Ruffin-Thompkins v. Experian Information Solutions, Inc.*, 422 F.3d 603, 607 (7th Cir. 2005). The moving party bears the initial burden of demonstrating the lack of any genuine issue of material fact. *Celotex*, 477 U.S. at 323. Once a properly supported motion for summary judgment is made, the adverse party "must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986). A genuine issue of material fact exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Est. of Simpson v. Gorbett*, 863 F.3d 740, 745 (7th Cir. 2017) (quoting *Anderson*, 477 U.S. at 248). Further, a "nonmovant's failure

to respond to a summary judgment motion, or failure to comply with Local Rule 56.1, does not, . . . automatically result in judgment for the movant"; the movant "must still demonstrate that it is entitled to judgment as a matter of law." *Keeton v. Morningstar, Inc.*, 667 F.3d 877, 884 (7th Cir. 2012) (citing *Raymond v. Ameritech Corp.*, 442 F.3d 600, 608 (7th Cir. 2006); *Reales v. Consolidated Rail Corp.*, 84 F.3d 993, 997 (7th Cir. 1996). In considering a summary judgment motion, the district court views the facts in the light most favorable to, and draws all reasonable inferences in favor of, the nonmoving party. *Apex Digital, Inc. v. Sears, Roebuck & Co.*, 735 F.3d 962, 965 (7th Cir. 2013) (citation omitted).

## Discussion

**Claim 2**

In Claim 2, Gully raises a First Amendment retaliation claim against Attebury for recommending Gully be found guilty of a disciplinary offense in retaliation for Gully's prior filing of a PREA allegation against one of Attebury's colleagues. An inmate may establish a prima facie case of retaliation by evidence showing that "(1) he engaged in constitutionally protected speech, (2) he suffered a deprivation likely to deter protected speech; and (3) his protected speech was a motivating factor in the defendants' actions." *Antoine v. Ramos*, 497 F. App'x 631, 633–34 (7th Cir. 2012) (citing *Kidwell v. Eisenhauer,* 679 F.3d 957, 965 (7th Cir. 2012)). "To prevail on such a claim, a plaintiff must establish a 'causal connection' between the government defendant's 'retaliatory animus' and the plaintiff's 'subsequent injury.'" *Nieves v. Bartlett*, 587 U.S. 391, 398, 139 S. Ct. 1715, 1722, 204 L. Ed. 2d 1 (2019) (quoting *Hartman v. Moore*, 547 U.S. 250, 259, 126 S. Ct. 1695, 164 L. Ed. 2d 441 (2006)). More "[s]pecfically, it must be a 'but-for' cause, meaning

that the adverse action against the plaintiff would not have been taken absent the retaliatory motive." *Id.* (citing *Hartman*, 547 U.S. at 260).

"To prove causation on a First Amendment retaliation claim, a plaintiff may rely on both direct and circumstantial evidence." *Lavite v. Dunstan*, 932 F.3d 1020, 1031 (7th Cir. 2019) (citing *Hobgood v. Ill. Gaming Bd.*, 731 F.3d 635, 643–44 (7th Cir. 2013); *Kidwell*, 679 F.3d at 965–66). "Direct evidence is evidence which, if believed by the trier of fact, will prove the particular fact in question without reliance upon inference or presumption." *Id.* (quoting *Kidwell*, 679 F.3d at 965). "Circumstantial evidence may include suspicious timing, ambiguous oral or written statements, or behavior towards or comments directed at other employees in the protected group." *Id.* (quoting *Long v. Teachers' Ret. Sys. of Illinois*, 585 F.3d 344, 350 (7th Cir. 2009).

Here, there is no dispute that the filing of the PREA complaint and Gully's placement in segregation for six months satisfy the first two elements. *See Kitterman v. Brinkley*, No. 18-CV-00112-SMY (S.D. Ill. Mar. 19, 2018) (holding actions taken in retaliation for filing PREA complaints and related grievances support a section 1983 claim). Further, Attaway's alleged statement during the disciplinary hearing that Gully was lying because he had previously filed a false PREA allegation against Attebury's friend, if true, could show that Attebury's recommendation of Gully being found guilty and punished with 6-month segregation was at least partially motivated by Gully's filing of the PREA allegation. (Doc. 104-1, p. 107).

Attebury counters that, although he was one of the two committee members, he was not the one who found Plaintiff guilty. But a reasonable jury could infer that Attebury's recommendation, along with his alleged statement accusing Gully of falsely filing a PREA

allegation, contributed to the final decision finding Gully guilty of the disciplinary offense of dangerous disturbance.

Attebury further denies ever making any statement during the hearing regarding Gully's PREA allegations. He argues that he recommended Gully be found guilty solely on the basis of the disciplinary report. He points to the Adjustment Committee Final Summary Report, which cites the disciplinary reports as grounds for finding Gully guilty. (Doc. 95-1 p. 33). He argues that Gully's testimony to the contrary is a self-serving statement that is insufficient to create a genuine dispute of material fact because it contradicts the written record. Yet, the Seventh Circuit has made clear that a district court cannot disregard a party's otherwise admissible statement simply because it serves its interests and is uncorroborated. *Jones v. Lamb*, 124 F.4th 463, 468 (7th Cir. 2024) (citing *Durukan Am., LLC v. Rain Trading, Inc.*, 787 F.3d 1161, 1164 (7th Cir. 2015). In any case, the Administrative Review Board thereafter decided to delete Gully's 105 Dangerous Disturbance charge and the imposed 6-month segregation, finding that the specific charge was unsubstantiated. A reasonable jury could infer that Attebury recommended Gully be found guilty, despite the disciplinary report being unsubstantiated, to retaliate against Gully for filing the PREA allegation against Attebury's colleague. This establishes the "but for" causation between the 6-month segregation punishment and the filing of the PREA allegation against Attebury's friend.

In sum, there are triable issues that prevent the entry of summary judgment in Attebury's favor in Claim 2.

**Qualified Immunity as to Claim 2**

Defendant Attebury also moved for qualified immunity on Claim 2, arguing that he did not violate clearly established rights. Generally, government officials are protected from civil liability

when performing discretionary functions under the doctrine of qualified immunity so long as "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S. Ct. 2727, 73 L. Ed. 2d 396 (1982); *see also Alvarado v. Litscher*, 267 F.3d 648, 652 (7th Cir. 2001). Thus, to evaluate a claim of qualified immunity, the Court engages in a two-part inquiry. The first question is whether the defendants' conduct violated a constitutional right. *Volkman v. Ryker*, 736 F.3d 1084, 1090 (7th Cir. 2013) (citing *Saucier v. Katz*, 533 U.S. 194, 201, 121 S. Ct. 2151, 150 L. Ed. 2d 272 (2001) (overruled in part by *Pearson v. Callahan*, 555 U.S. 223, 236–42, 129 S. Ct. 808, 172 L. Ed. 2d 565 (2009)). The second question is whether that particular constitutional right was "clearly established" at the time of the alleged violation. *Id.* The two questions may be considered in either order. *Volkman*, 736 F.3d at 1090 (citing *Pearson*, 555 U.S. at 236-42). "For a constitutional right to be clearly established, its contours 'must be sufficiently clear that a reasonable official would understand that what he is doing violates that right[.]'" *Estate of Escobedo v. Bender,* 600 F.3d 770, 779 (7th Cir. 2010), quoting *Hope v. Pelzer,* 536 U.S. 730, 739 (2002).

Here, the question is whether a reasonable official would understand that he violated Gully's rights by recommending that he be found guilty of the offense of dangerous disturbance and be punished with 6-month segregation for filing a PREA allegation. The Seventh Circuit has found that segregation confinement can violate First Amendment rights when done in retaliation. *See Babcock v. White,* 102 F.3d 267, 275-276 (7th Cir. 1996). In addition, "retaliation against constitutionally protected conduct is actionable regardless of whether the defendant's actions independently violate the constitution. A prison official . . . would have been on notice that *any*

retaliation, whatever its shape, could give rise to liability." *Id.* Therefore, Attebury is not entitled to qualified immunity on Claim 2.

**Claim 3**

In Claim 3, Plaintiff raises an Eighth Amendment deliberate indifference claim against Trotter for her handling of Gully's mental health and suicidal behavior. He accuses Trotter of being callous towards his deteriorating mental health by authorizing the issuance of the disciplinary tickets to him during a time of mental health crisis on November 17, 2021, and ultimately providing him with a pen while encouraging him to attempt suicide.

The Eighth Amendment prohibits the unnecessary and wanton infliction of pain, physical or psychological, by acts that lack any "penological justification." *Lisle v. Welborn*, 933 F.3d 705, 718-19 (7th Cir. 2019) (quoting *Rhodes v. Chapman*, 452 U.S. 337, 346, 101 S.Ct. 2392, 69 L.Ed.2d 59 (1981); *Hope*, 536 U.S. at 737. Harsh verbal interactions between inmates and prison staff, or even verbal harassment, most of the time do not rise to the level of a constitutional violation. *Beal v. Foster*, 803 F.3d 356, 358 (7th Cir. 2015). However, the Seventh Circuit has recognized that in extreme and rare cases, such as when "medical staff use an inmate's known psychological vulnerability to cause psychological anguish," verbal harassment may amount to cruel and unusual punishment. *Lisle*, 933 F.3d at 719

It is also well established that the Eighth Amendment prohibits the wanton infliction of pain through the lack of adequate medical care to an inmate's serious medical needs. *Estelle v. Gamble*, 429 U.S. 97, 104, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976); *Petties v. Carter*, 836 F.3d 722, 727–28 (7th Cir. 2016) (en banc). To succeed on a deliberate indifference claim, an inmate must "provide evidence, either direct or circumstantial," establishing that "he had an objectively serious

medical need," which the defendants knew of but consciously disregarded. *Brown v. Osmundson*, 38 F.4th 545, 550 (7th Cir. 2022) (internal citations omitted). Mere negligence, civil objective recklessness, or "medical malpractice do[] not become a constitutional violation merely because the victim is a prisoner." *Reck v. Wexford Health Sources, Inc.*, 27 F.4th 473, 483 (7th Cir. 2022) (quoting *Estelle*, 429 U.S. 106). Rather, the defendant must have exhibited a conduct that approaches "a total unconcern for the prisoner's welfare in the face of serious risks" and is akin to criminal recklessness. *Brown*, 38 F.4th at 550; *McGee v. Adams*, 721 F.3d 474, 481 (7th Cir. 2013).

In *Lisle*, the Seventh Circuit recognized a category of claims that "lie[] in the intersection of deliberate and pointless infliction of psychological injury and deliberate indifference in medical care." 933 F.3d at 716. There, an inmate accused a nurse, who was responsible for his care while he was suicidal and at a mental health crisis, of intentionally disregarding his risk of suicide by repeatedly mocking him for his three earlier unsuccessful suicide attempts, telling him that "he should have done it 'properly,'" and encouraging him to "do a better job next time." *Id.* at 712. The Seventh Circuit reversed the district court's grant of summary judgment in the nurse's favor, rejecting the proposition that verbal harassment never amounts to cruel and unusual punishment. *Id.* at 717. The court noted the nurse's statements went beyond "simple verbal harassment," and she did so while she was "uniquely situated to aggravate [the inmate's] condition by using her specialized knowledge to target his psychological vulnerabilities, causing him psychological pain." *Id.* While the nurse denied making those statements and pointed to her otherwise undisputed provision of medical treatment to the inmate, the Court found a genuine dispute of material fact that precluded summary judgment in her favor. The Court further noted that receipt of "*some* medical care does not automatically defeat a claim of deliberate indifference if a fact finder could

infer the treatment was 'so blatantly inappropriate as to evidence intentional mistreatment likely to seriously aggravate' a medical condition." *Id.* at 719. It concluded that "[e]ncouraging a suicidal inmate to kill himself . . . would fit this description." *Id.*

Plaintiff argues that *Lisle* is directly on point, and the Court agrees. As in *Lisle*, Gully's risk of suicide is an objectively serious medical condition. Plaintiff was placed on suicide watch after providing a suicide note to Defendant Trotter on October 13, 2021, and he remained under crisis watch at least through November 17, 2021, when the allegations against Trotter took place. Within that timeframe, Gully attempted twice to commit suicide. While Trotter attempts to cast doubt on the genuineness and seriousness of those suicide attempts, there is no dispute that during that timeframe, Trotter and other medical providers continued to place Gully under suicide watch. At a minimum, the record creates a genuine dispute that precludes summary judgment on that ground.

Further, the record here shows that Trotter was aware of Gully's risk of suicide when she authorized the issuance of the disciplinary ticket and handed him the pen while encouraging him to commit suicide. As the nurse in *Lisle*, Trotter frequently monitored and evaluated Gully throughout his time on suicide watch, and therefore, she was "uniquely situated to aggravate [his] condition by using her specialized knowledge to target his psychological vulnerabilities," and cause him pain. *Lisle*, 933 F.3d at 718. The record allows an inference that she did so when she authorized the issuance of the disciplinary ticket while Gully was on a 10-minute crisis watch, and handed him the pen, telling him, "If you're going to kill yourself, you're going to do it anyway, it's only a matter of time, have fun at it." This is the exact type of behavior that the Seventh Circuit found in *Lisle* to amount to cruel and unusual punishment.

Trotter does not attempt to distinguish *Lisle*. She argues, however, that the authorization of the disciplinary ticket and the pen was an exercise of professional judgment and denies ever making a statement encouraging Gully to commit suicide. She contends that Gully's statements to that effect in the Complaint are insufficient to create a triable issue. However, Gully's complaint was verified. (Doc. 1, p. 20); *Alarm Detection Sys., Inc. v. Vill. of Schaumburg*, 145 F.4th 675, 680 (7th Cir. 2025) (noting that "sworn statements of fact within a verified complaint can serve as evidence at summary judgment" so long as they are specific enough to allow an inference as to how the affiant reached the factual conclusion). In any case, Gully also restated those specific allegations in his deposition and incorporated them in his Response to Defendant's Statement of Material Facts (Doc. 105, ¶ 31) and in his Statement of Facts (Doc. 105, ¶20), with proper citation to the record. *See* Fed. R. Civ. P. 56 (c)(1) (including depositions on the material that properly support an assertion of a genuine dispute of material fact). Accordingly, Gully has advanced a triable issue as to whether Trotter made a statement encouraging him to commit suicide.

Trotter further argues that Plaintiff has failed to show that he suffered any "serious injuries from any such attempts at self-harm," and to prove any damages. However, the record supports the finding that Gully suffered a psychological anguish that, under *Lisle*, can amount to cruel and unusual punishment. Indeed, an inmate may not bring an action "for mental or emotional injury suffered while in custody without a prior showing of physical injury or the commission of a sexual act." 42 U.S.C. § 1997e(e); *see also Lisle*, 933 F.3d at 719. Yet, the record still supports a finding of some physical injury, given that following his interaction with Trotter, Gully inserted the pen in his rectum in an attempt to commit suicide, which necessitated his transfer to the emergency room. While Trotter points to medical records suggesting that the pen was "retrieved without pain

or complications," this does not mean that Plaintiff's attempted suicide did not cause him a physical injury that satisfies § 1997e(e). In any case, the Seventh Circuit has read § 1997e(e) as limiting only compensatory damages, not nominal or punitive damages involving no physical injury. *Calhoun v. DeTella*, 319 F.3d 936, 941 (7th Cir. 2003). Therefore, Defendant Trotter is not entitled to summary judgment on that ground.

Accordingly, Defendant Trotter's Motion for Summary Judgment on Claim 3 is **DENIED**.

**Claim 6**

Plaintiff also brings intentional infliction of emotional distress claims against Defendants Attebury and Trotter. To prevail on a state law claim of intentional infliction of emotional distress ("IIED"), a plaintiff must establish that the defendants' conduct was "extreme and outrageous," that the defendants knew their conduct would, or was highly probable to, inflict on Plaintiff severe emotional distress, and that their conduct did in fact cause such levels of distress. *Dixon v. Cnty. of Cook*, 819 F.3d 343, 351 (7th Cir. 2016). A conduct is "extreme and outrageous" when it goes "beyond all possible bounds of decency" and is "intolerable in a civilized community." *Id*. Factors to be considered in assessing whether the conduct is "extreme and outrageous" include the power or control the defendant has over the plaintiff, the defendant's reasonable belief that his "objective was legitimate," and the defendant's knowledge that the plaintiff was "peculiarly susceptible to emotional distress, by reason of some physical or mental condition or peculiarity." *Franciski v. Univ. of Chicago Hosps.*, 338 F.3d 765, 769 (7th Cir. 2003) (citing *McGrath v. Fahey,* 126 Ill.2d 78, 127 Ill.Dec. 724, 533 N.E.2d 806, 809 (1988)). Not every conduct that satisfies the Eighth Amendment deliberate indifference standard will be so "extreme and outrageous" as to amount to intentional infliction of emotional distress. *Dixon*, 819 F.3d at 351.

### 1. *Defendant Attebury*

Gully has raised triable issues preventing the entry of summary judgment in Attebury's favor on Claim 6. The Seventh Circuit's decision in *Howard v. Koeller* is instructive. 756 F. App'x 601 (7th Cir. 2018). There, an inmate who was a jailhouse lawyer raised First Amendment and intentional infliction of emotional distress claims, stemming from a correctional officer's alleged intentional misrepresentation in a conduct report that the inmate revealed another inmate's name during a disciplinary proceeding. *Id.* at 603–04. The plaintiff argued that the officer did so to trigger a punitive response from other inmates against the plaintiff. *Id.* The plaintiff was thereafter transferred to a segregation unit that housed inmates with behavioral and mental health issues, where other inmates retaliated against the plaintiff by screaming and hitting their doors, walls, and toilets whenever the plaintiff tried to speak or sleep. *Id.* The district court granted summary judgment in the officer's favor as to the IIED claim on the ground that the officer's statement in the report was not an intentional lie. *Id.* The Seventh Circuit reversed, noting that the truthfulness of the statement remained a factual matter to be resolved by the jury. *Id.*

Like the plaintiff in *Howard*, Gully alleges that he suffered from severe emotional distress as a result of a prison official's interference with a disciplinary proceeding in retaliation for a First Amendment-protected activity. To be sure, the officer in *Howard* knowingly placed the plaintiff at risk of retaliation by other inmates, a qualitatively distinct circumstance from the case at bar. But here, Gully was "peculiarly susceptible to emotional distress," due to his underlying mental health issues. Attebury alleges that there is no evidence showing he was aware of Gully's mental health history, but falls short of affirmatively stating he was not. In any case, the defendant's knowledge of the plaintiff's peculiar susceptibility to emotional distress is only one of the factors

to be considered in evaluating whether the conduct was extreme and outrageous. Here, the remaining factors support such a finding. Attebury, a correctional officer, had definite control over Gully. Further, in light of the Administrative Review Board's finding that the dangerous disturbance charge was unsubstantiated, and taking as true Gully's allegations about Attebury's statement during the hearing, the recommendation that Plaintiff be found guilty and be punished with 6-month segregation could not be deemed to serve any legitimate purpose. Accordingly, the Court finds that the record allows an inference that Attebury's conduct was extreme and outrageous.

Further, the records allow an inference that Attebury knew his conduct would, or was highly likely to, inflict on Gully severe emotional distress, regardless of his knowledge of Gully's preexisting mental health issues. A reasonable jury could conclude that even inmates who do not face serious mental health issues can suffer severe emotional distress by being punished with 6-month segregation in retaliation for engaging in a First Amendment-protected activity.

Further, Plaintiff attempted to commit suicide on November 17, 2021, which is sufficient for a reasonable jury to infer that Gully, in fact, suffered severe emotional distress. Attebury counters that Gully has failed to establish a causal connection between any severe emotional distress he suffered and Attebury's conduct. He points out that Gully had received about 300 charges while in IDOC without experiencing a mental breakdown. However, Gully also testified that Attebury recommended the maximum punishment for the offense of dangerous disturbance, while Gully had never received the maximum punishment in any of those prior charges. (Doc. 104-1, pp. 107, 120). Attebury has not shown that Gully was punished with a 6-month segregation in any prior disciplinary proceeding. Furthermore, Gully has not alleged that he was improperly

found guilty of any of the other 300 charges out of retaliation for a First Amendment-protected activity. Therefore, the fact that Gully did not suffer severe emotional distress after being charged with other disciplinary tickets does not negate an inference of causal connection between Attebury's conduct and Gully's subsequent suicide attempts.

Accordingly, Attebury is not entitled to summary judgment in Claim 6.

### 2. *Defendant Trotter*

Gully has likewise raised triable issues on his IIED claim that preclude summary judgment in Trotter's favor. Drawing all reasonable inferences in Gully's favor, a reasonable jury could conclude that Trotter's conduct was extreme and outrageous. First, Trotter had enhanced power and control over Gully, being one of the providers responsible for monitoring and evaluating Plaintiff's mental health state while in segregation and crisis watch. Second, while the issuance of the disciplinary ticket and the handing of the pen to Gully, in isolation, could be deemed to serve a legitimate objective, when coupled with Trotter's contemporaneous statement encouraging Gully, who was in crisis watch and had recently made two suicide attempts, to commit suicide, it exceeded "all possible bounds of decency." Third, because Trotter frequently monitored and evaluated Gully during his time on suicide watch and was privy to his two prior attempts to commit suicide, she was well aware of his "peculiar susceptibility to emotional distress." Based on that record, a reasonable jury could infer that authorizing the disciplinary ticket while Gully was on a 10-minute crisis watch, and handing him the pen, telling him, "if you're going to kill yourself, you're going to do it anyway, it's only a matter of time, have fun at it" was an extreme and outrageous conduct, especially when coming from the individual bestowed with the duty to monitor and evaluate Gully's mental state.

Trotter points out that Gully had previously used the pen safely to sign documents for his transfer to another facility without incident. She argues that, based on Gully's prior conduct, she could not have predicted that he would have utilized the pen to attempt suicide. Again, Trotter isolates the facts and disregards the effect of her alleged statement encouraging Gully to commit suicide. Given her medical background and her purported statement when she handed Gully the pen, a reasonable jury could infer that she knew her conduct would, or was highly probable to, inflict severe emotional distress on Gully.

Finally, Trotter argues that Gully has failed to establish that he actually suffered severe emotional distress, pointing to the lack of physical injuries resulting from the attempted suicide. But physical injury is not an element of an IIED claim. There is no dispute that Plaintiff attempted to commit suicide on November 17, 2021. This is sufficient for a reasonable jury to infer that Gully, in fact, suffered severe emotional distress. As discussed above, while § 1997e(e) limits recovery of compensatory damages for psychological injuries in the absence of physical injury or the commission of a sexual act, here the record supports an inference of at least some physical injury resulting from Gully's attempted suicide that required his transfer to the emergency department.

Accordingly, Trotter is not entitled to summary judgment on Claim 6.

## Conclusion

For the reasons set forth above, Defendant Nathan Attebury's Motion for Summary Judgment (Doc. 95) and Defendant Lyndsey Trotter's Motion for Summary Judgment (Doc. 96) are **DENIED**.

**IT IS SO ORDERED.**

**DATED: July 20, 2026**

**Hon. Reona J. Daly**
**United States Magistrate Judge**